IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF KANSAS AND MID-MISSOURI, INC. on behalf of itself, its staff, and its patients, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| JANE DRUMMOND, Director of the Missouri Department of Health and Senior Services, in her official capacity; JEREMIAH W. NIXON, Attorney General of Missouri, in his official capacity; DANIEL K. KNIGHT, Prosecuting Attorney of Boone County, Missouri, in his official capacity; and JAMES F. KANATZAR, Prosecuting Attorney of Jackson County, Missouri, in his official capacity, | ) ) ) ) ) ) ) ) ) ) ) | Case No.: 07-4164-CV-C- NKL |
| Defendants. | ) | |

COMPLAINT

Plaintiff, by its undersigned attorneys, brings this complaint against the above-named Defendants, their employees, agents and successors in office, and in support thereof state the following:

1. This is an action under 42 U.S.C. § 1983 claiming that Defendants' application to Plaintiff of the recently-enacted amendment to Missouri's Ambulatory Surgical Center Licensing Law contained in HCS/HB1055, which is to be codified at Mo. Rev. Stat. § 197.200 (hereinafter, "the Act" or "the 2007 Amendment"), and of its implementing regulations (the "regulatory scheme"), violates rights secured to Plaintiff and its patients by the Fourteenth Amendment to the United States Constitution.

2. The Act requires facilities to be licensed as ambulatory surgical centers ("Surgi-Center") if they are "operated for the purpose of performing . . . five or more first trimester abortions per month." Id. (attached as Exhibit A). The 2007 Amendment was enacted in order to eliminate, or make more difficult, access to abortion in Missouri. Violation of the Act is a Class A misdemeanor, with every day of violation constituting a separate offense. The Act takes effect on August 28, 2007.

3. Plaintiff provides first-trimester abortions at two sites in Missouri: Kansas City, Missouri (the Brous Center), and Columbia, Missouri (the Columbia Center). The Brous Center provides no surgical abortions, and provides medication abortion through 8 weeks of pregnancy. The Columbia Center provides abortions by a minor surgical method through 13.4 weeks of pregnancy, and by the provision of medication only, without any surgery, through 8 weeks of pregnancy. Both sites have been providing these services for many years without notable incidents relating to the health of their patients.

4. Missouri's Department of Health and Senior Services ("DHSS") has interpreted the Act as applicable to the Brous Center, thus requiring the Brous Center to be licensed as a Surgi-Center, even though it does not provide surgical abortions or any other type of surgery.

5. Moreover, while the pre-existing regulatory scheme provides that the onerous and inflexible requirements relating to the physical structure of a Surgi-Center are not applicable to existing facilities, but only to new facilities or to renovations of existing facilities, so long as the existing facility complies with a reduced set of requirements with which the Columbia Center complies, DHSS has refused to apply this "grandfathering" provision to the Columbia Center.

6. Finally, while the pre-existing regulatory scheme also allows for the waiver of requirements, and Plaintiff has sought waivers of the onerous and unnecessary physical

2

requirements for both the Brous Center and the Columbia Center, to date, DHSS has not granted those waivers.

7. As a result, in the absence of relief from this Court, Plaintiff will be forced to cease all abortion services at both the Columbia Center and the Brous Center at the close of business on August 27, 2007, thereby eliminating – either permanently or for the extended period of time necessary to renovate one of the facilities – all access to abortion services for women in central and western Missouri, in violation of their rights, and Plaintiff's rights, under the fourteenth amendment to the United States Constitution.

## JURISDICTION AND VENUE

8. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

9. Plaintiff's action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202.

10. Venue in this court is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this district and because Defendants Drummond and Nixon, in their official capacities, reside in the Central Division of the Western District of Missouri.

## PARTIES

### A. Plaintiff

11. Planned Parenthood of Kansas and Mid-Missouri, Inc. ("PPKM") is a not-for-profit corporation, organized under the laws of Missouri.

12. PPKM operates the Columbia Center in Columbia, Missouri. The Columbia Center provides general reproductive health care, including family planning services, testing and

3

treatment for sexually transmitted infections, cervical and breast cancer screening services, pregnancy testing, and all-options counseling.

13. The Columbia Center also provides first-trimester medication and surgical abortion, and regularly provides more than five first-trimester surgical abortions per month. Plaintiff brings this action on its own behalf and on behalf of its Columbia Center patients who presently or in the future desire, or may desire, abortion services in Missouri.

14. PPKM also operates the Brous Center in Kansas City, Missouri. The Brous Center provides general reproductive health care, including family planning services, testing and treatment for sexually transmitted infections, cervical and breast cancer screening services, pregnancy testing, all-options counseling, and medication abortion.

15. The Brous Center also provides medication abortion, and regularly provides more than five medication abortions per month. It does not provide surgical abortions, or any other surgical procedure. Plaintiff brings this action on its own behalf and on behalf of its Brous Center patients who presently or in the future desire, or may desire, abortion services in Missouri.

### B. Defendants

16. Defendant Jane Drummond is the Director of the Missouri Department of Health and Senior Services ("DHSS"), the agency responsible for deciding applications for Surgi-Center licensure, Mo. Rev. Stat. §§ 197.215, 197.220, as well as for adopting the reasonable rules, regulations, and standards necessary to implement Missouri's Ambulatory Surgical Center Licensing Law, Mo. Rev. Stat. § 197.225. Director Drummond is sued in her official capacity, as are her agents and successors.

17. Defendant Jay Nixon is the Attorney General for the State of Missouri. The Attorney General is charged with enforcing Missouri's Ambulatory Surgical Center Licensing Law, and

has specific authority to seek injunctive and other relief for violations thereof. Mo. Rev. Stat. § 197.235. Attorney General Nixon is sued in his official capacity, as are his agents and successors.

18. Defendant Daniel Knight is the Prosecuting Attorney for Boone County, Missouri, where the Columbia Center is located. Mr. Knight is authorized to prosecute violations of the Missouri criminal law, including violations of the Act. Mr. Knight is sued in his official capacity, as are his agents and successors.

19. Defendant James Kanatzar is the Prosecuting Attorney for Jackson County, Missouri, where the Brous Center is located. Mr. Kanatzar is authorized to prosecute violations of the Missouri criminal law, including violations of the Act. Mr. Kanatzar is sued in his official capacity, as are his agents and successors.

**The Statutory and Regulatory Framework**

20. Missouri's Ambulatory Surgical Center Licensing Law ("licensing law") is contained at Sections 197.200 et seq. of Missouri's Public Health and Welfare Code. Operation of an ambulatory surgical center without a license is a Class A misdemeanor, with every day of violation constituting a separate offense. Mo. Rev. Stat. § 197.235.

21. The 2007 Amendment requires that "any establishment operated for the purpose of performing or inducing any second or third trimester abortions or five or more first trimester abortions per month" be licensed as a Surgi-Center. Previously, licensure was required, in relevant part, for any "public or private establishment operated primarily for the purpose of performing surgical procedures or primarily for the purpose of performing childbirths." Mo. Rev. Stat. § 197.200 (pre-amendment version).

5

22. The 2007 Amendment was part of a broader bill, HCS/HB1055 (attached as Ex. A). Another provision of the bill bars any entity that provides or refers for abortions from providing sexual education in the schools, and a third provision establishes an alternatives to abortion program but excludes from funding the affiliates of any organizations that provide abortion.

23. Before signing the bill into law on July 6, 2007, Governor Matt Blunt issued a written statement calling it "one of the strongest pieces of pro-life legislation in Missouri history." Governor's Column: Treating All Life with Dignity and Respect (July 6, 2007) (attached as Ex. B).

24. Following the signing ceremony, the bill's sponsor in the House, Rep. Therese Sander, was quoted as stating in regard to the bill that her purpose in life has been to undo the damage to life done by Roe v. Wade. Barbara Shoun, Baptists Rejoice Over Pro-Life Bill Signing, the Pathway, Jul. 19, 2007 (attached as Ex. C). And the sponsor of the companion bill in the Senate, Sen. Delbert Scott, was quoted as stating that "the legislation really will save the lives of unborn children in the state of Missouri." Id.

25. In implementing Missouri's licensing law, DHSS has established regulations governing three different types of Surgi-Centers: general Surgi-Centers, abortion facilities, and birthing centers. Each type of Surgi-Center has different requirements for licensure, administration, and physical construction. The regulations are attached as Exhibit D.

26. For each of the three types, DHSS created a set of physical requirements for new construction that does not apply to facilities already in operation when they were first required to be licensed. Pursuant to "grandfathering" provisions, pre-existing facilities have either been exempted from physical requirements altogether (in the case of general Surgi-Centers) or

6

Case 2:07-cv-04164-ODS   Document 1   Filed 08/20/07   Page 6 of 19

licensed under a parallel but more general set of physical requirements designed specifically for pre-existing facilities (in the case of abortion facilities and birthing centers).

27. When the licensing law was first enacted in 1975, DHSS established physical requirements for "[a]ll new ambulatory surgical centers," as well as for future "additions to and remodeling of existing licensed ambulatory surgical centers," and noted that "[t]hese rules are applicable to ambulatory surgical centers which began operation or construction or renovation of a building to operate an ambulatory surgical center on any date after [the effective date of the regulations]." Mo. Code Regs. Ann. tit. 13, § 50-30 (1975 version) (attached as Exhibit E). Facilities already in operation when the licensing law was enacted were not required to comply with these physical requirements.

28. When DHSS updated these regulations in 1990, the updated regulations similarly protected existing and legally operating facilities from having to comply with the new physical structure requirements until they were "remodeled or expanded." Mo. Code Regs. Ann. tit. 19, § 30-30.030 (1). This is the version of the regulation in effect today.

29. Similarly, when birthing centers first became licensed in 1995, DHSS established two sets of physical requirements: one set forth extensive physical requirements for "new birthing center construction," and the other set forth parallel but more general requirements for "[e]xisting birthing centers," defined as "those birthing facilities already in operation at the time these rules are adopted." Mo. Code Regs. Ann. tit. 19, §§ 30-30.100; 30-30.110.

30. Until today, DHSS took the same two-tiered approach when licensing abortion facilities.

31. Prior to the Act, a facility operated primarily for the purpose of performing surgical procedures, including abortions, was required to be licensed as a Surgi-Center. Accordingly, in 1987 DHSS promulgated regulations governing licensure of abortion facilities, defined as "a

7

Case 2:07-cv-04164-ODS   Document 1   Filed 08/20/07   Page 7 of 19

facility in which the number of patients having abortions represents fifty-one percent (51%) or more of the patients treated or seen for any health condition or where fifty-one percent (51%) or more of the revenues of the facility are from abortions or procedures related to abortions." Mo. Code Regs. Ann. tit. 19, § 30-30.050.

32. DHSS established two sets of physical requirements for abortion facilities: one for "[n]ew abortion facilities," and a parallel but modified set for "[a]ny abortion facility in operation at the time these rules are adopted." Mo. Code Regs. Ann. tit. 19, §§ 30-30.070(2); 30-30.070(3).

33. The facilities that were "grandfathered" into licensure under the modified requirements had not previously been licensed by DHSS. Thus, the facilities licensed under the lesser physical requirements were (like the Columbia and Brous Centers) facilities already in operation providing abortions, but never before required to be licensed.

34. DHSS's statutory obligation under Missouri's licensing law is to adopt regulations that "assure quality patient care and patient safety." Mo. Rev. Stat. § 197.225. Presumably, in establishing its physical requirements for pre-existing abortion facilities, DHSS made the determination that they were adequate to protect maternal health and safety at facilities at which abortions represent fifty-one percent or more of the patients treated or seen.

**Factual Allegations**

    A. The Brous Center and medication abortion

35. The Brous Center has been providing medication abortion since 2005. The Brous Center was already an experienced abortion provider when it began providing medication abortions, having previously provided surgical abortions from 1975 to 1998.

36. Medication abortion is a Food and Drug Administration-approved, non-invasive method of terminating an early pregnancy by oral medication. It is commonly provided out of doctors' offices and clinics nationwide.

37. Since its approval, an increasing number of women, in Missouri and throughout the country, have chosen medication over surgical abortion in early pregnancy. Many women choose medication abortion over surgical abortion because they find it less invasive and more like natural miscarriage. Also, some women choose the method because it allows the patient to feel she has more control over the process.

38. The Brous Center uses the most common combination of medications to induce abortion, mifepristone, a female hormone necessary to maintain early pregnancy, and misoprostol, a synthetic steroid used to soften and open the cervix and induce uterine contractions.

39. The patient takes mifepristone at the Brous Center, then takes the misoprostol at her home twenty-four to forty-eight hours later. The products of conception are passed at home, usually approximately four or five hours after the patient takes the misoprostol.

40. In short, medication abortion is not a surgical procedure. Rather, the abortion is accomplished through oral medication, and the products of conception passed at home.

41. Following Governor Blunt's signature of the Act on July 6, on July 18, PPKM sought clarification from DHSS that the Brous Center is not required to be licensed under the Act because it performs no surgical procedures. PPKM 7/18/07 Letter (Brownlie Dec. Ex. 1).

42. On July 31, DHSS responded with a letter stating that despite the fact that the Brous Center performs no surgical procedures, the 2007 Amendment requires the Brous Center to be licensed as a Surgi-Center. DHSS 7/31/07 Letter (Brownlie Dec. Ex. 2).

43. For licensure, the Brous Center would be required to comply with numerous physical requirements that were developed as safeguards for patient health and safety during surgical procedures. These requirements have no bearing on patient health or safety during the prescription of an oral medication.

44. For example, the Brous Center would be required to comply with:

- Requirements as to corridor and door width that were developed to ensure ease of moving patients on a stretcher or surgical gurney – despite the fact that stretchers and surgical gurneys are not used in the provision of medication abortion;

- Requirements as to the length, width, ceiling height, ventilation, and surgical lights for procedure rooms – despite the fact that no "procedures" are done in the provision of medication abortion;

- Scrub facilities that are knee- or foot-operated to protect sterility – despite the fact that no "scrubbing" is done to prepare for providing medication abortion;

- Recovery rooms of sufficient size to accommodate four recovery beds or recliners for each procedure room, with three feet of clear space on both sides and at the foot of each bed or recliner – despite the fact that recovery rooms are not used in the provision of medication abortion.

45. These burdensome physical requirements are medically unnecessary and not reasonably related to maternal health in the provision of medication abortion.

46. On August 9, PPKM submitted an application requesting waiver of these physical requirements for the Brous Center, pursuant to DHSS's authority to grant requests for deviation under Mo. Code Regs. Ann. tit. § 30-30.70(1) ("Brous Application"). As documented in that application, by the Act's effective date the Brous Center will comply with the requirements of

Mo. Code Regs. Ann. tit. 19, §§ 30-30.050 and 30-30.060, with the exception of certain requirements of § 30-30.060 that (as detailed in the Brous Application) do not appear on their face to apply to the non-surgical services provided at the Brous Center. Brous Application (Brownlie Dec. Ex. 3)

PPKM has not yet received a response to this application.

### B. The Columbia Center and surgical abortion

47. The Columbia Center began providing abortions in 1975. With the exception of a suspension of services from 1999 to 2002, it has been providing safe and effective abortion services for over thirty years.

48. The Columbia Center provides both medication and first-trimester surgical abortions. With some schedule variation, it provides these services approximately one day a week. Abortions and related services account for well under 51% of the Columbia Center's patients and revenues.

49. Prior to the 2007 Amendment, the Columbia Center had never been required or eligible to be licensed as a Surgi-Center because it is not a facility operated primarily for the purpose of performing surgical procedures.

50. The only surgical procedure performed at the Columbia Center is first-trimester abortion. Abortion is one of the safest surgical procedures and is especially safe in the first trimester. First-trimester abortion requires no incisions and no general anesthesia.

51. First-trimester surgical abortion is as safe as, or safer than, many outpatient surgical procedures routinely performed in physicians' offices, such as non-pregnant dilation and curettage procedures or endometrial biopsies. However, unlike performance of an abortion, performance of other particular procedures does not subject a medical facility to the regulatory

scheme unless the facility is operated primarily for the purpose of performing surgical procedures.

52. Following Governor Blunt's signature of the Act on July 6, in the same letter where PPKM sought clarification that the Act did not apply to the Brous Center, PPKM submitted an application to DHSS for licensure of the Columbia Center as a Surgi-Center ("Columbia Application"). PPKM also submitted additional supporting documentation on July 23, 2007.

53. As documented in the Columbia Application and supporting documentation, by the Act's effective date of August 28, 2007 the Columbia Center is prepared to comply with the regulatory scheme's requirements for abortion facility licensure (Mo. Code Regs. Ann. tit. 19, § 30-30.050) and facility organization and management (Mo. Code Regs. Ann. tit. 19, § 30-30.060). The latter regulation includes detailed requirements on topics including the Columbia Center's governing body, bylaws, smoking policies, infection control, policies and procedures for processing laundry, personnel policies, medical staffing requirements, hospital admitting privileges or transfer agreement, record keeping, discharge instructions, informed consent procedures, emergency tray contents, quality assurance programs, and laboratory services, and complaints procedures.

54. As documented in the Columbia Application, the Columbia Center is also prepared comply with the physical requirements for pre-existing facilities by the Act's effective date. Mo. Code Regs. Ann. tit. 19, § 30-30.070(3).

55. On July 31, DHSS responded with a letter listing the ways in which the Columbia Center is not in compliance with the physical requirements for new abortion facilities, thus implicitly refusing to allow the Columbia Center to take advantage of the grandfathering provision. DHSS 7/31/07 Letter (Brownlie Dec. Ex. 2).

56. For licensure, DHSS thus would require the Columbia Center to comply with numerous additional physical requirements not otherwise imposed on pre-existing facilities. These include such requirements as:

- Patient corridors at least six feet wide and door widths of at least forty-four inches – whereas the Columbia Center already complies with the requirement that corridors be sufficiently wide to allow a patient on a stretcher to be moved from any point in the facility to a street-level exit;

- Scrub facilities located outside but immediately available to the procedure room – whereas the Columbia Center already complies with the requirement that scrub facilities be located convenient to the procedure room;

- Personnel change rooms provided for each sex – whereas the Columbia Center already complies with the requirement that personnel change rooms be provided; the Columbia Center's personnel are all female; and

- A recovery room with space for at least four recovery beds or recliners with three feet clear space around each – whereas the Columbia Center already complies with the requirement that the recovery room be of sufficient size to accommodate at least four recovery beds or recliners for each procedure room, with the beds or recliners spaced to permit easy staff access to each patient;

as well as numerous other requirements.

57. The burdensome additional physical requirements DHSS has imposed on the Columbia Center's licensure are medically unnecessary and not reasonably related to maternal health. Pursuant to its statutory obligation, DHSS presumably already determined the parallel

requirements for pre-existing facilities to be adequate to protect maternal health and safety at facilities at which abortions represent fifty-one percent or more of the patients treated or seen.

58. Bringing the Columbia Center into compliance with the requirements for new construction would involve significant expense. It would also require closing down at least some portions of the facility while extensive renovations proceed.

59. On August 9, 2007, PPKM submitted an application requesting waiver of these requirements for the Columbia Center, pursuant to DHSS's authority to grant requests for deviation under Mo. Code Regs. Ann. tit. 19, § 30-30.70(1).

60. PPKM has not yet received a response to this application.

## V. IMPACT OF THE REGULATORY SCHEME ON WOMEN IN MISSOURI

61. For the Columbia Center, compliance with the physical requirements for new construction would necessitate costly renovations that will not promote maternal health. Absent a private donor to cover the costs of extensive construction, at least some portion will be passed on to the Columbia Center's patients, significantly increasing the cost of abortion services and preventing some women from obtaining an abortion. Portions of the Columbia Center would have to be shut down while these unnecessary renovations proceed, threatening its ability to offer family planning and other services to the women of Missouri. And until the unnecessary renovations were completed and approved by DHSS, the Columbia facility would be shut down entirely as an abortion service provider.

62. For the Brous Center, compliance with the physical requirements for new construction is not financially possible. Enforcement of the regulatory scheme will force the Brous Center to stop providing abortion services permanently.

63. Enforcement of the regulatory scheme thus will drastically reduce the availability of abortion in Missouri, shutting down the state's only abortion facilities outside of the St. Louis area. Women will be forced to travel from all corners of the state to the state's eastern border in order to obtain an abortion in Missouri.

64. This travel will increase the cost to women and delay the procedure. And if the Columbia Center is able to reopen following medically unnecessary renovations, but is forced to raise prices for abortion services in order to defray some of its expenses, the increased cost of obtaining an abortion at that facility will be prohibitive for some women, and cause delay for others.

65. Any delay in obtaining abortion is significant because gestational age is an important determinant of medical risk. Although abortion is one of the safest surgical procedures, both the morbidity (risk of major complications) and mortality (risk of death) rates for abortion increase as the pregnancy advances. And in the case of medication abortion, which is provided only early in the first trimester, if the women is unable to obtain an abortion until later in pregnancy she loses this non-surgical option.

66. The Act and the regulatory scheme, as DHSS currently proposes to apply them to Plaintiff, have the purpose and effect either to eliminate or to make more difficult and expensive the provision of abortions by Plaintiff. The Act and the regulatory scheme, as DHSS currently proposes to apply them to Plaintiff, have no medical justification. Moreover, the regulatory scheme, as DHSS currently proposes to apply it to Plaintiff, singles out Plaintiff for treatment under these regulations that is different from all other medical providers subject to the ambulatory surgical center statute, as well as medical providers subject to other statutes and regulations relating to physical structure of their facilities.

15
Case 2:07-cv-04164-ODS    Document 1    Filed 08/20/07    Page 15 of 19

## FIRST CLAIM FOR RELIEF

67. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 66 above.

68. The Act violates Plaintiff's and Plaintiff's patients' rights to equal protection of the laws guaranteed by the fourteenth amendment to the United States Constitution

## SECOND CLAIM FOR RELIEF

69. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 68 above.

70. The Act violates Plaintiff's patients' rights of liberty and privacy guaranteed by the fourteenth amendment to the United States Constitution.

## THIRD CLAIM FOR RELIEF

71. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 70 above.

72. The Act and the regulatory scheme, as DHSS currently proposes to apply them to Plaintiff, violates Plaintiff's and Plaintiff's patients' rights to equal protection of the laws guaranteed by the fourteenth amendment to the United States Constitution.

## FOURTH CLAIM FOR RELIEF

73. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 73 above.

74. The Act and the regulatory scheme, as DHSS currently proposes to apply them to Plaintiff, violates Plaintiff's patients' rights of liberty and privacy under the fourteenth amendment to the United States Constitution.

## NOTICE OF STATE LAW CLAIMS

75. Defendants' actions are also illegal and unconstitutional under various provisions of state law. Plaintiff is foreclosed from bringing these claims in this Court pursuant to the Eleventh Amendment to the U.S. Constitution. See, <u>Pennhurst State School & Hospital v. Halderman</u>, 465

U.S. 89, 106 (1984). Plaintiff cannot assert these claims in this Court; but Plaintiff is not waiving them. These claims include, but are not limited to:

    (a) That the Act and the regulatory scheme, as DHSS proposes to apply them to Plaintiff, violate Article I, Section 2 of the Missouri Constitution; and

    (b) That DHSS's proposed application of the Act and the regulatory scheme to Plaintiff is arbitrary, capricious, unreasonable, unauthorized by law, and/or an abuse of discretion, in violation of the Missouri Administrative Procedure Act, Mo. Rev. Stat. § 536.010 et. seq.

    WHEREFORE Plaintiff requests that this Court:

1. Issue a declaratory judgment that the Act violates the rights of Plaintiff and its patients as protected by the fourteenth amendment to the United States Constitution, and is therefore void and of no effect;

2. Issue permanent injunctive relief, without bond, restraining the enforcement, operation, and execution of the Act against Plaintiff;

3. Issue a declaratory judgment that the Act and regulatory scheme, as DHSS proposes to apply them to the Brous Center, violate the rights of Plaintiff and its patients as protected by the fourteenth amendment to the United States Constitution, and is therefore void and of no effect;

4. Issue a declaratory judgment that the Act and regulatory scheme, as DHSS proposes to apply them to the Columbia Center, violate the rights of Plaintiff and its patients as protected by the fourteenth amendment to the United States Constitution, and is therefore void and of no effect;

5. Issue permanent injunctive relief, without bond, restraining the enforcement, operation, and execution of the regulatory scheme against Plaintiff by enjoining Defendants, their agents,

employees, appointees, or successors from enforcing, threatening to enforce, or otherwise applying the regulatory scheme's physical requirements to the Brous Center;

6. Issue permanent injunctive relief, without bond, restraining the enforcement, operation, and execution of the regulatory scheme against Plaintiff by enjoining Defendants, their agents, employees, appointees, or successors from enforcing, threatening to enforce, or otherwise applying the regulatory scheme's physical requirements for new facilities to the Columbia Center;

7. Grant Plaintiff attorneys' fees, costs and expenses pursuant to 42 U.S.C. § 1988; AND

8. Grant such further relief as this Court deems just and proper.

Respectfully submitted,

s/ Arthur A. Benson II
‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗

Arthur A. Benson II, Mo. Bar No. 21,107
Jamie Lansford, Mo. Bar No. 31,133
Arthur Benson & Associates
4006 Central Avenue (Courier Zip: 64111)
Kansas City, Missouri 64171-9007
(816) 531-6565
(816) 531-6688 (telefacsimile)
abenson@bensonlaw.com
jlansford@bensonlaw.com

Roger Evans*
Eve Gartner*
Jennifer Sandman
Planned Parenthood Federation of America, Inc.
434 West 33rd Street
New York, New York 10001
(212) 541-7800
(212) 247-6811 (telefacsimile)

18

Roger.Evans@ppfa.org
Eve.Gartner@ppfa.org
Jennifer.Sandman@ppfa.org

*Application for admission *pro hac vice* pending

Attorneys for Plaintiff