IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF KANSAS | ) | |
| AND MID-MISSOURI, INC., on behalf of | ) | |
| itself, its staff, and its patients, | ) | FIRST AMENDED COMPLAINT |
| | ) | |
| Plaintiff, | ) | Case No. 07-4164-CV-C-ODS |
| | ) | |
| v. | ) | |
| | ) | |
| JANE DRUMMOND, Director of the Missouri | ) | |
| Department of Health and Senior Services, in | ) | |
| her official capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

Plaintiff, by its undersigned attorneys, brings this first amended complaint against the above-named Defendants, their employees, agents and successors in office, and in support thereof states the following:

1.     The State of Missouri has amended its Ambulatory Surgical Center Licensing Law (ASCLL), to require that any facility "operated for the purpose of performing . . . five or more first trimester abortions per month" be licensed as an ambulatory surgical center.  This amendment (The Act) singles out abortion as the only medical service for which the licensing requirement is triggered at five or more procedures per month (or one procedure if it is a second trimester abortion).

2.     The regulatory scheme already in effect to implement the ASCLL has specific regulations for Abortion Facilities.  These regulations establish two sets of physical requirements.  One, the "New Construction" requirements, applies to facilities that are constructed or significantly renovated after October 25, 1987.  The second, the "Pre-Existing

1

Facility" requirements, applies to facilities that are already in operation at the time they become subject to the ASCLL.

3.      Plaintiff provides first-trimester abortions at two sites in Missouri:  One location, the Brous Center, in Kansas City, provides no surgical abortions, or any other surgery, but does provide medication abortion through 8 weeks of pregnancy.   The second location, the Columbia Center, in Columbia, provides abortions by a minor surgical method through 13.4 weeks of pregnancy, and by the provision of medication only, without any surgery, through 8 weeks of pregnancy, and has been doing so, except between 1999 and 2002, since April of 1987.

4.      Missouri's Department of Health and Senior Services ("DHSS") has interpreted the Act as applicable to the Brous Center, thus requiring the Brous Center to be licensed as an ambulatory surgical center, even though it does not provide surgical abortions or any other type of surgery.   As for the Columbia Center, DHSS has determined that in order for it be licensed it must comply with the New Facility Regulations, even though it was in operation as an abortion provider when the regulations went into effect in October 1987, as well as being an existing facility at the time the Act brought it within the ASCLL in 2007.  As authorized by the regulations Plaintiff has applied for waivers of many of the most onerous and medically unnecessary regulatory requirements for both clinics, but DHSS has not responded to those requests.

5.      The Act was enacted for the purpose of eliminating, or severely limiting, access to abortion in Missouri; and DHSS is applying the Act and the regulations to Plaintiff both for the purpose and with the effect, absent judicial intervention, of eliminating or severely limiting access to abortion in Missouri

2

6.      Plaintiff has filed this action, pursuant to 42 U.S.C. 1983, claiming that: (a) the Act violates the due process clause of the Fourteenth Amendment because it was enacted for the purpose of imposing a substantial obstacle on access to abortion; (b) the Act violates the equal protection clause of the Fourteenth Amendment; (c) the Act and the regulations, as applied by DHSS to Plaintiff, violate the due process clause in that they are being applied by DHSS with the purpose and the effect, absent judicial intervention, of imposing a substantial obstacle on access to abortion; (d) the Act and the regulations, as applied by DHSS to Plaintiff, violate the due process clause in that they are not reasonably related to patient health and safety and depart from accepted medical practice; and (e) the Act and the regulations, as applied by DHSS to Plaintiff, violate the equal protection clause.

## JURISDICTION AND VENUE

7.      This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

8.      Plaintiff's action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202.

9.      Venue in this court is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this district and because Defendants Drummond and Nixon, in their official capacities, reside in the Central Division of the Western District of Missouri.

## PARTIES

### A.   Plaintiff

10.     Planned Parenthood of Kansas and Mid-Missouri, Inc. ("PPKM") is a not-for-profit corporation, organized under the laws of Missouri.

3

11.     Plaintiff operates the Columbia Center in Columbia, Missouri.  The Columbia Center provides general reproductive health care, including family planning services, testing and treatment for sexually transmitted infections, cervical and breast cancer screening services, pregnancy testing, and all-options counseling.

12.     The Columbia Center also provides first-trimester medication and surgical abortion, and regularly provides more than five first-trimester surgical abortions per month.  The Columbia Center has never been licensed as an Abortion Facility or any other type of ambulatory surgical center, as it was not required to be under the pre-Amendment version of the Act.  Plaintiff brings this action on its own behalf and on behalf of its Columbia Center patients who presently or in the future desire, or may desire, abortion services in Missouri.

13.     Plaintiff also operates the Brous Center in Kansas City, Missouri.  The Brous Center provides general reproductive health care, including family planning services, testing and treatment for sexually transmitted infections, cervical and breast cancer screening services, pregnancy testing, all-options counseling, and medication abortion.

14.     The Brous Center also provides medication abortion, and regularly provides more than five medication abortions per month.  It does not provide surgical abortions, or any other surgical procedure.  The Brous Center has never been licensed as an Abortion Facility or any other type of ambulatory surgical center, as it was not required to be under the pre-Amendment version of the Act.  Plaintiff brings this action on its own behalf and on behalf of its Brous Center patients who presently or in the future desire, or may desire, abortion services in Missouri.

**B.     Defendants**

15.     Defendant Jane Drummond is the Director of the Missouri Department of Health and Senior Services ("DHSS"), the agency responsible for deciding applications for Surgi-Center

licensure, Mo. Rev. Stat. §§ 197.215, 197.220, as well as for adopting the reasonable rules, regulations, and standards necessary to implement Missouri's Ambulatory Surgical Center Licensing Law, Mo. Rev. Stat. § 197.225. Director Drummond is sued in her official capacity, as are her agents and successors.

16.     Defendant Jay Nixon is the Attorney General for the State of Missouri. The Attorney General is charged with enforcing Missouri's Ambulatory Surgical Center Licensing Law, and has specific authority to seek injunctive and other relief for violations thereof. Mo. Rev. Stat. § 197.235. Attorney General Nixon is sued in his official capacity, as are his agents and successors.

17.     Defendant Daniel Knight is the Prosecuting Attorney for Boone County, Missouri, where the Columbia Center is located. Mr. Knight is authorized to prosecute violations of the Missouri criminal law, including violations of the Act. Mr. Knight is sued in his official capacity, as are his agents and successors.

18.     Defendant James Kanatzar is the Prosecuting Attorney for Jackson County, Missouri, where the Brous Center is located. Mr. Kanatzar is authorized to prosecute violations of the Missouri criminal law, including violations of the Act. Mr. Kanatzar is sued in his official capacity, as are his agents and successors.

## FACTUAL ALLEGATIONS

### A.     The Statutory and Regulatory Framework

19.     The ASCLL is contained at Sections 197.200 et seq. of Missouri's Public Health and Welfare Code. Operation of an ambulatory surgical center without a license is a Class A misdemeanor, with every day of violation constituting a separate offense. Mo. Rev. Stat. § 197.235.

5

20.     The ASCLL requires licensure for any "public or private establishment operated primarily for the purpose of performing surgical procedures or primarily for the purpose of performing childbirths."  Mo. Rev. Stat. § 197.200 (pre-amendment version).   DHSS promulgated regulations to implement the ASCLL, and defined "primarily for the purpose of" (except for birthing centers) as a facility where at least 51% of the patients treated or the revenues received were for a surgical procedure. Mo. Code Regs. Ann. tit. 19 § 30-30.010 (General Surgi-Centers); § 30-30.050 (Abortion Facilities).

21.     The Act is an abortion-specific amendment to the ASCLL to require that "any establishment operated for the purpose of performing or inducing any second or third trimester abortions or five or more first trimester abortions per month" be licensed as an ambulatory surgical center.  Mo. Rev. Stat. § 197.200(1) (as amended by the Act).

22.      Plaintiff's Columbia and Brous Centers were not licensed under the pre-Amendment version of the Act, as neither fell within the definition of ambulatory surgical center.

23.     Now, as the Act has changed the trigger to 5 first trimester abortions per month, both centers are subject to the ASCLL.

24.     Under pre-existing ASCLL regulations, DHSS has established three different types of ambulatory surgical centers: General Surgi-Centers, Abortion Facilities, and Birthing Centers. These regulations were attached as Exhibit D to Plaintiff's Complaint.  For each of the three types of facilities, DHSS created a set of physical requirements for newly-constructed or significantly-renovated facilities ("New Construction" requirements) that do not apply to facilities already in operation when they were first required to be licensed ("Pre-Existing Facilities").  Pre-Existing Facilities have either been exempted from physical requirements altogether (in the case of General Surgi-Centers) or licensed under a parallel but more general set

of physical requirements designed specifically for Pre-Existing Facilities (in the case of Abortion Facilities and Birthing Centers).

25.     DHSS's distinction between requirements for New Construction and those for Pre-Existing Facilities is in recognition of the fact that the very specific requirements that may be appropriate for facilities being constructed or significantly renovated when the regulations are already in place – and which accordingly can be designed expressly to comply with those requirements – would be inappropriate for Pre-Existing Facilities.

26.     This consistent distinction between New Construction requirements and Pre-Existing Facility requirements is clear from examination of the regulations.

27.     For example, when the licensing law was first enacted in 1975, DHSS established physical requirements for General Surgi-Centers that applied to "[a]ll new ambulatory surgical centers," as well as to future "additions to and remodeling of existing licensed ambulatory surgical centers," and noted that "[t]hese rules are applicable to ambulatory surgical centers which began operation or construction or renovation of a building to operate an ambulatory surgical center on any date after [the effective date of the regulations]." Mo. Code Regs. Ann. tit. 13, § 50-30 (1975 version) (attached to Plaintiff's Complaint as Exhibit E).  Facilities already in operation when the licensing law was enacted were not required to comply with these physical requirements.

28.     When DHSS updated the General Surgi-Center regulations in 1990, the updated regulations similarly protected Pre-Existing Facilities from having to comply with the new physical structure requirements until they were "remodeled or expanded."   Mo. Code Regs. Ann. tit. 19, § 30-30.030 (1).  This is the version of the regulation in effect today.

29.     Similarly, when Birthing Centers first became licensed in 1995, DHSS established two sets of physical requirements: one set forth extensive physical requirements for "new birthing center construction," and the other set forth parallel but more general requirements for "[a]ny birthing center existing and in continuous operation prior to the date of the adoption of this rule." .Mo. Code Regs. Ann. tit. 19, §§ 30-30.100; 30-30.110.

30.     DHSS follows the same approach when licensing Abortion Facilities. DHSS has established two sets of physical requirements for abortion facilities: one for "[n]ew abortion facilities," and a parallel but modified set for "[a]ny abortion facility in operation at the time these rules are adopted." Mo. Code Regs. Ann. tit. 19, §§ 30-30.070(2); 30-30.070(3).

31.     DHSS's statutory obligation under Missouri's licensing law is to adopt regulations that "assure quality patient care and patient safety." Mo. Rev. Stat. § 197.225. Presumably, in establishing its physical requirements for Pre-Existing Abortion Facilities, DHSS made the determination that these regulations were adequate to protect maternal health and safety at facilities at which abortions represent fifty-one percent or more of the patients treated or seen.

**B.     The Act's Improper Purpose**

32.     The Act was part of a broader bill, HCS/HB1055 (attached to Plaintiff's Complaint as Ex. A). Another provision of the bill bars any entity that provides or refers for abortions from providing sexual education in the schools, and a third provision establishes an alternatives to abortion program but excludes from funding the affiliates of any organizations that provide abortion.

33.     Before signing the bill into law on July 6, 2007, Governor Matt Blunt issued a written statement calling it "one of the strongest pieces of pro-life legislation in Missouri history."

8

<u>Governor's Column: Treating All Life with Dignity and Respect</u> (July 6, 2007) (attached to Plaintiff's Complaint as Ex. B).

34.     Following the signing ceremony, the bill's sponsor in the House, Rep. Therese Sander, was quoted as stating in regard to the bill that her purpose in life has been to undo the damage to life done by <u>Roe v. Wade</u>.  Barbara Shoun, <u>Baptists Rejoice Over Pro-Life Bill Signing</u>, the Pathway, Jul. 19, 2007 (attached to Plaintiff's Complaint as Ex. C).  And the sponsor of the companion bill in the Senate, Sen. Delbert Scott, was quoted as stating that "the legislation really will save the lives of unborn children in the state of Missouri."  <u>Id.</u>

35.     DHSS has been similarly open about its view and purpose in implementing the Act.  Defendant Drummond has attempted to "fire" Missouri's Attorney General as the attorney representing the executive branch in this litigation.  In her letter advising the Attorney General of her intentions, Drummond wrote, "[the Act] is very pro-life while you are radically pro-abortion."  Drummond 8/22/07 Letter (Plaintiff's Exhibit 5 from TRO Hearing).

36.     Drummond has endeavored, instead, to be represented by the Alliance Defense Fund.  The Alliance Defense Fund is a religious organization with a stated purpose of "reform[ing] American law so that all human life will be respected and protected from conception to death."  http://faithandfreedomsunday.org/issues/SanctityofLife/Default.aspx (last visited August 29, 2007).

37.     In correspondence with Plaintiff in July 2007, DHHS had suggested that PPKM's clinics had to be licensed under the Abortion Facility regulations.

38.     Following hearing on Plaintiff's motion for a Temporary Restraining Order on August 23, and with the Brous and Columbia applications for licensure as Abortion Facilities still pending, DHSS reversed its prior position (taken before DHSS had retained the Alliance Defense

Fund) and indicated that it no longer intended to apply the Abortion Facility regulations to the licensure of abortion providers. Instead, abortion providers would have to comply with the requirements for General Surgi-Centers.

39.     Compliance with the General Surgi-Center regulations would have imposed burdens far beyond, and even more medically unnecessary than, those required by the Abortion Facility New Construction requirements.

40.     Moreover, if the Act were to require compliance with the General Surgi-Center regulations, then even Missouri's sole remaining abortion clinic, located in St. Louis, and already licensed under the Abortion Facility regulations, would have been required to undergo substantial renovations or close. Thus, DHSS was prepared to close down abortion services at every single provider in the state of Missouri.

41.     At a hearing on August 31, on the motion of the intervenor to intervene and be granted a temporary restraining order, DHSS reversed its position once again, and stated that it no longer considers the General Surgi-Center regulations applicable to providers of abortion services.

**C.     The Effect of the Act on Plaintiff's Two Centers That Provide Abortions**

   **1.     The Brous Center and Medication Abortion**

42.     The Brous Center has been providing medication abortion since 2005. The Brous Center was already an experienced abortion provider when it began providing medication abortions, having previously provided surgical abortions from 1975 to 1998.

43.     Medication abortion is a Food and Drug Administration-approved, non-invasive method of terminating an early pregnancy by oral medication. It is commonly provided out of doctors' offices and clinics nationwide.

44.     Since its approval, an increasing number of women, in Missouri and throughout the country, have chosen medication over surgical abortion in early pregnancy.   Many women choose medication abortion over surgical abortion because they find it less invasive and more like natural miscarriage.  Also, some women choose the method because it allows the patient to feel she has more control over the process.

45.     The Brous Center uses the most common combination of medications to induce abortion, mifepristone, a female hormone necessary to maintain early pregnancy, and misoprostol, a synthetic steroid used to soften and open the cervix and induce uterine contractions.

46.     The patient takes mifepristone at the Brous Center, then takes the misoprostol at her home twenty-four to forty-eight hours later.  The products of conception are passed at home, usually approximately four or five hours after the patient takes the misoprostol.

47.     In short, medication abortion is not a surgical procedure.  Rather, the abortion is accomplished through oral medication, and the products of conception passed at home.

48.     Following Governor Blunt's signature of the Act on July 6, on July 18, PPKM sought clarification from DHSS that the Brous Center is not required to be licensed under the Act because it performs no surgical procedures.  PPKM 7/18/07 Letter (Plaintiff's Ex. 1 at TRO Hearing).

49.     On  July 31, DHSS responded with a letter stating that despite the fact that the Brous Center performs no surgical procedures, the 2007 Amendment requires the Brous Center to be licensed as an ambulatory surgical center.  DHSS 7/31/07 Letter (Plaintiff's Ex. 2 at TRO Hearing).

50.     On August 9, the Brous Center submitted an application ("Brous Application") for licensure as an ambulatory surgical center, and specifically as an Abortion Facility, pursuant to Mo. Code Regs. tit. 19, §§ 30-30.040 – 30-30.070.  Brous Application (Plaintiff's Ex. 3 at TRO Hearing).

51.     For licensure under these regulations, the Brous Center would be required to comply with numerous physical requirements that were developed as safeguards for patient health and safety during surgical procedures.  These requirements have no bearing on patient health or safety during the prescription of an oral medication.

52.     For example, the Brous Center would be required to comply with:

- Requirements as to the length, width, ceiling height, ventilation, and surgical lights for procedure rooms – despite the fact that no "procedures" are done in the provision of medication abortion;

- Requirements as to corridor and door width that were developed to ensure ease of moving patients on a stretcher or surgical gurney – despite the fact that stretchers and surgical gurneys are not used in the provision of medication abortion;

- Scrub facilities that are knee- or foot-operated to protect sterility – despite the fact that no "scrubbing" is done to prepare for providing medication abortion;

- Recovery rooms of sufficient size to accommodate four recovery beds or recliners for each procedure room, with three feet of clear space on both sides and at the foot of each bed or recliner – despite the fact that recovery rooms are not used in the provision of medication abortion.

53.     These burdensome physical requirements are medically unnecessary and not reasonably related to maternal health in the provision of medication abortion.

54.     Accordingly, the Brous Center's licensure application included a request for waiver of these physical requirements, pursuant to DHSS's authority to grant requests for deviation under Mo. Code Regs. Ann. tit. 19, § 30-30.70(1).   As documented in the Brous Application, the Brous Center is prepared to comply with the requirements of Mo. Code Regs. Ann. tit. 19, §§ 30-30.050 and 30-30.060 within one month, with the exception of certain requirements of § 30-30.060 that (as detailed in the Brous Application) do not appear on their face to apply to the non-surgical services provided at the Brous Center.  Brous Application (Plaintiff's Ex. 3 at TRO Hearing).

55.     PPKM has not yet received a response to this application.

### 2.     The Columbia Center and Surgical Abortion

56.     The Columbia Center began providing abortions in 1975, and has been providing abortions in its current location since April of 1987.  With the exception of a suspension of services from 1999 to 2002 it has been providing safe and effective abortion services for over thirty years, and for twenty years at the current location.

57.     The Columbia Center provides both medication and first-trimester surgical abortions. With some schedule variation, it provides these services approximately one day a week.  Abortions and related services account for well under 51% of the Columbia Center's patients and revenues.

58.     Prior to the 2007 Amendment, the Columbia Center had never been required or eligible to be licensed as a ambulatory surgical center because it is not a facility operated primarily for the purpose of performing surgical procedures.  Accordingly, the Columbia Center has never been licensed as an Abortion Facility or any other form of ambulatory surgical center.

59.     The only surgical procedure performed at the Columbia Center is first-trimester abortion.  Abortion is one of the safest surgical procedures and is especially safe in the first trimester.   First-trimester abortion requires no incisions and no general anesthesia.

60.     First-trimester surgical abortion is as safe as, or safer than, many outpatient surgical procedures routinely performed in physicians' offices, such as non-pregnant dilation and curettage procedures or endometrial biopsies.  However, unlike performance of an abortion, performance of other particular procedures does not subject a medical facility to the regulatory scheme unless the facility is operated primarily for the purpose of performing surgical procedures.

61.     Following Governor Blunt's signature of the Act on July 6, in the same letter where PPKM sought clarification that the Act did not apply to the Brous Center, PPKM submitted an application to DHSS for licensure of the Columbia Center as an Abortion Facility ("Columbia Application") (Plaintiff's Ex. 1 to TRO Hearing).  PPKM also submitted additional supporting documentation on July 23, 2007.

62.     As documented in the Columbia Application and supporting documentation, the Columbia Center is prepared within one month to make the minor changes necessary to comply with the regulatory scheme's requirements for abortion facility licensure (Mo. Code Regs. Ann. tit. 19, § 30-30.050) and facility organization and management (Mo. Code Regs. Ann. tit. 19, § 30-30.060).  The latter regulation includes detailed requirements on topics including the Columbia Center's governing body, bylaws, smoking policies, infection control, policies and procedures for processing laundry, personnel policies, medical staffing requirements, hospital admitting privileges or transfer agreement, record keeping, discharge instructions, informed

consent procedures, emergency tray contents, quality assurance programs, and laboratory services, and complaints procedures.

63.    As documented in the Columbia Application, the Columbia Center is also prepared within one month to comply with the physical requirements for Pre-Existing Facilities . Mo. Code Regs. Ann. tit. 19, § 30-30.070(3).

64.    On July 31, DHSS responded with a letter listing the ways in which the Columbia Center is not in compliance with the New Construction requirements for Abortion Facilities, thus implicitly refusing to apply the Pre-Existing Facility regulations to the Columbia Center.  DHSS 7/31/07 Letter (Brownlie Dec. Ex. 2).

65.    For licensure, DHSS thus would require the Columbia Center to comply with numerous additional physical requirements not otherwise imposed on Pre-Existing Facilities.  These include such requirements as:

- Patient corridors at least six feet wide and door widths of at least forty-four inches – whereas the Columbia Center already complies with the requirement that corridors be sufficiently wide to allow a patient on a stretcher to be moved from any point in the facility to a street-level exit;

- Scrub facilities located outside but immediately available to the procedure room – whereas the Columbia Center already complies with the requirement that scrub facilities be located convenient to the procedure room;

- Personnel change rooms provided for each sex – whereas the Columbia Center already complies with the requirement that personnel change rooms be provided; the Columbia Center's personnel are all female; and

- A recovery room with space for at least four recovery beds or recliners with three feet clear space around each – whereas the Columbia Center already complies with the requirement that the recovery room be of sufficient size to accommodate at least four recovery beds or recliners for each procedure room, with the beds or recliners spaced to permit easy staff access to each patient;

as well as numerous other requirements.

66.     The burdensome additional physical requirements DHSS has imposed on the Columbia Center's licensure are medically unnecessary and not reasonably related to maternal health. Pursuant to its statutory obligation, DHSS presumably already determined the parallel requirements for Pre-Existing Facilities to be adequate to protect maternal health and safety at facilities at which abortions represent fifty-one percent or more of the patients treated or seen.

67.     Bringing the Columbia Center into compliance with the requirements for New Construction would involve significant expense.  It would also require closing down at least some portions of the facility while extensive renovations proceed.

68.     On August 9, 2007, PPKM submitted an application requesting waiver of these requirements for the Columbia Center, pursuant to DHSS's authority to grant requests for deviation under Mo. Code Regs. Ann. tit. 19, § 30-30.70(1).

69.     PPKM has not yet received a response to this application.

70.     DHSS's repeated reversals of position on which sets of regulations apply, as well as its willingness to apply regulations that are grossly medically inappropriate, are further evidence of its improper purpose in applying the regulatory scheme to Plaintiff.

**D.  Impact of the Act and Regulatory Scheme on Women In Missouri**

71.    For the Columbia Center, compliance with Act and regulatory scheme as DHSS now proposes to apply them – namely, with the New Construction Requirements for Abortion Facilities – would necessitate costly renovations that will not promote maternal health.  Absent a private donor to cover the costs of extensive rebuilding, at least some portion will be passed on to the Columbia Center's patients, significantly increasing the cost of abortion services and preventing some women from obtaining an abortion.  Portions of the Columbia Center would have to be shut down while these unnecessary renovations proceed, threatening its ability to offer family planning and other services to the women of Missouri.  And until the unnecessary renovations were completed and approved by DHSS, the Columbia facility would be shut down entirely as an abortion service provider.

72.    For the Brous Center, compliance with these physical requirements is not financially possible.  Enforcement of the Act and regulatory scheme, as DHSS proposes to apply them to Brous, will force the Brous Center to stop providing abortion services permanently.

73.    Enforcement of the Act and regulatory scheme, as DHSS seeks to apply them, thus will drastically reduce the availability of abortion in Missouri, shutting down the state's only abortion facilities outside of the St. Louis area.  Women will be forced to travel from all corners of the state to the state's eastern border in order to obtain an abortion in Missouri.

74.    This travel will increase the cost to women and delay the procedure.   And if the Columbia Center is able to reopen following medically unnecessary renovations, but is forced to raise prices for abortion services in order to defray some of its expenses, the increased cost of obtaining an abortion at that facility will be prohibitive for some women, and cause delay for others.

75.     Any delay in obtaining abortion is significant because gestational age is an important

determinant of medical risk.  Although abortion is one of the safest surgical procedures, both the

morbidity (risk of major complications) and mortality (risk of death) rates for abortion increase

as the pregnancy advances.  And in the case of medication abortion, which is provided only early

in the first trimester, if the women is unable to obtain an abortion until later in pregnancy she

loses this non-surgical option.

76.     The Act and the regulatory scheme, as DHSS currently proposes to apply them to

Plaintiff, have the purpose and effect either to eliminate or to make more difficult and expensive

the provision of abortions by Plaintiff.   The Act and the regulatory scheme, as DHSS currently

proposes to apply them to Plaintiff, have no medical justification.  Moreover, the Act and

regulatory scheme, as DHSS currently proposes to apply them to Plaintiff, single out Plaintiff for

treatment that is different from all other medical providers subject to the ambulatory surgical

center statute, as well as medical providers subject to other statutes and regulations relating to

physical structure of their facilities.

**FIRST CLAIM FOR RELIEF**

77.     Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 76 above.

78.     The Act violates Plaintiff's patients' rights of liberty and privacy guaranteed by the

fourteenth amendment to the United States Constitution, in that the Act was enacted for the

purpose of imposing a substantial obstacle on access to abortion.

**SECOND CLAIM FOR RELIEF**

79.     Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 78 above.

80.     The Act violates Plaintiff's and Plaintiff's patients' rights to equal protection of the

laws guaranteed by the fourteenth amendment to the United States Constitution

Case 2:07-cv-04164-ODS   Document 47   Filed 09/07/07   Page 18 of 21

## THIRD CLAIM FOR RELIEF

81.  Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 81 above.

82.  The Act and the regulatory scheme, as DHSS currently proposes to apply them to Plaintiff, violates Plaintiff's patients' rights of liberty and privacy under the fourteenth amendment to the United States Constitution, in that the Act and regulatory scheme, as applied, would have the purpose and the effect of imposing a substantial obstacle on access to abortion, and in that, as DHSS proposes to apply them, they are not reasonably related to patient health and safety and depart from accepted medical practice.

## FOURTH CLAIM FOR RELIEF

83.  Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 82 above.

84.  The Act and the regulatory scheme, as DHSS currently proposes to apply them to Plaintiff, violates Plaintiff's and Plaintiff's patients' rights to equal protection of the laws guaranteed by the fourteenth amendment to the United States Constitution.

## NOTICE OF STATE LAW CLAIMS

85.  Defendants' actions are also illegal and unconstitutional under various provisions of state law.  Plaintiff is foreclosed from bringing these claims in this Court pursuant to the Eleventh Amendment to the U.S. Constitution.  See Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 106 (1984).  Plaintiff cannot assert these claims in this Court; but Plaintiff is not waiving them.  These claims include, but are not limited to:

(a)  That the Act and the regulatory scheme, as DHSS proposes to apply them to Plaintiff, violate Article I, Section 2 of the Missouri Constitution; and

(b)  That DHSS's proposed application of the Act and the regulatory scheme to Plaintiff is arbitrary, capricious, unreasonable, unauthorized by law, and/or an abuse of

discretion, in violation of the Missouri Administrative Procedure Act, Mo. Rev. Stat. §
536.010 et. seq.;

WHEREFORE Plaintiff requests that this Court:

1.     Issue a declaratory judgment that the Act violates the rights of Plaintiff and its patients as
protected by the fourteenth amendment to the United States Constitution, and is therefore void
and of no effect;

2.     Issue permanent injunctive relief, without bond, restraining the enforcement, operation,
and execution of the Act against Plaintiff;

3.     Issue a declaratory judgment that the Act and regulatory scheme, as DHSS proposes to
apply them to the Brous Center, violate the rights of Plaintiff and its patients as protected by the
fourteenth amendment to the United States Constitution, and is therefore void and of no effect;

4.     Issue a declaratory judgment that the Act and regulatory scheme, as DHSS proposes to
apply them to the Columbia Center, violate the rights of Plaintiff and its patients as protected by
the fourteenth amendment to the United States Constitution, and is therefore void and of no
effect;

5.     Issue permanent injunctive relief, without bond, restraining the enforcement, operation,
and execution of the regulatory scheme against Plaintiff by enjoining Defendants, their agents,
employees, appointees, or successors from enforcing, threatening to enforce, or otherwise
applying the regulatory scheme's physical requirements to the Brous Center;

6.     Issue permanent injunctive relief, without bond, restraining the enforcement, operation,
and execution of the regulatory scheme against Plaintiff by enjoining Defendants, their agents,
employees, appointees, or successors from enforcing, threatening to enforce, or otherwise

applying the regulatory scheme's New Construction requirements for Abortion Facilities to the

Columbia Center;

7. Grant Plaintiff attorneys' fees, costs and expenses pursuant to 42 U.S.C. § 1988; AND

8. Grant such further relief as this Court deems just and proper.


Respectfully submitted,


_/S/ Arthur Benson_____

Arthur A. Benson II, Mo. Bar No. 21,107
Jamie Lansford, Mo. Bar No. 31,133
Arthur Benson & Associates
4006 Central Avenue (Courier Zip: 64111)
Kansas City, Missouri 64171-9007
(816) 531-6565
(816) 531-6688 (telefacsimile)
abenson@bensonlaw.com
jlansford@bensonlaw.com

Jennifer Sandman
Roger Evans
Eve C. Gartner
Helene T. Krasnoff
Planned Parenthood Federation of America, Inc.
434 West 33rd Street
New York, New York 10001
(212) 541-7800
(212) 247-6811 (telefacsimile)
Roger.Evans@ppfa.org
Eve.Gartner@ppfa.org
Jennifer.Sandman@ppfa.org

Attorneys for Plaintiff