IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD OF KANSAS AND MID-MISSOURI INC., et al., | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) Case NO. 07-4164-CV-C-ODS ) |
| JANE DRUMMOND, JAY NIXON, DANIEL KNIGHT, and JAMES F. KANATZAR, | ) ) ) ) |
| Defendants. | ) |

<u>ORDER AND OPINION GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND DENYING PLAINTIFFS' MOTIONS FOR PULLMAN ABSTENTION</u>

Pending are Plaintiff Planned Parenthood of Kansas and Mid-Missouri Inc.'s ("PPKM") and Plaintiff Dr. Allen Palmer's Motions for Preliminary Injunction (Docs. # 54 and 52). Also pending are Plaintiffs' Motions for <u>Pullman</u> Abstention with an <u>England</u> Reservation of Rights (Docs. # 58 and 64). For the following reasons, both Motions for Preliminary Injunction are hereby GRANTED with orders for the parties to proceed with negotiations as discussed below, and both Motions for <u>Pullman</u> Abstention are DENIED.

**I.  BACKGROUND**

Missouri's Ambulatory Surgical Center Licensing Law ("the Act"), codified at section 197.200 of the Revised Missouri Statutes, was amended this year with the amendments going into effect on August 28, 2007. Formerly, § 197.200(1), RSMo, defined "ambulatory surgical center" as "any . . . establishment operated primarily for the purpose of performing surgical procedures . . . ." In its 2007 session, the Missouri General Assembly amended § 197.200, RSMo, to include within this definition "any establishment operated for the purpose of performing or inducing any second or third trimester abortions or five or more first trimester abortions per month." Facilities included within the definition of ambulatory surgical center ("ASC") must be licensed by

the Department of Health and Senior Services ("DHSS"). § 197.210, RSMo. Failure to obtain a license is a class A misdemeanor with every violation constituting a separate offense. § 197.235, RSMo.

Pursuant to its authority under the Act, DHSS has promulgated regulations governing the types of services provided by ASCs at 19 C.S.R. § 30-30.010 to 30-30.110. The regulations create three categories of ASCs: general ambulatory surgical centers covered by 19 C.S.R. § 30-30.010 to 30-30.040; abortion facilities (a subset of ASC) covered by 19 C.S.R. § 30-30.050 to 30-30.070; and birthing centers (also a subset of ASC) covered by 19 C.S.R. § 30-30.080 to 30-30.110. At the outset of this litigation, DHSS took the position that any facility newly brought within the Act (those performing "any second or third trimester abortions or five or more first trimester abortions per month") would be considered a general ambulatory surgical center, the most strictly regulated of the three categories. However, on August 31, 2007, at a Hearing for Temporary Restraining Order, Dean Linneman, DHSS Division of Regulation & Licensure, Section for Health & Licensure section administrator testified that DHSS had reevaluated its interpretation of the regulations and would include the newly covered facilities within the definition of abortion facilities. The regulations included within 19 C.S.R. § 30-30.050 to 30-30.070 will, therefore, be the focus in this case.

The regulations for abortion facilities include physical requirements that apply to new facilities constructed and existing facilities undergoing significant renovations after the regulations were adopted on October 25, 1987 ("New Construction" regulations). 19 CSR § 30-30.070(2). The regulations also include more flexible physical requirements that apply to abortion facilities in operation as of October 25, 1987 ("Pre-Existing Facility requirements"). 19 CSR § 30-30.070(3). The regulations also include a provision explaining the process by which applicants may seek deviations from the physical requirements. 19 CSR § 30-30.070(1).

PPKM provides first-trimester abortions at two locations in Missouri: the Brous Center in Kansas City and the Columbia Center in Columbia. The Brous Center formerly provided surgical abortions from 1975 to 1998 and has been providing only

non-surgical abortions via medication since 2005. Medication abortion is an FDA-approved method for terminating a pregnancy with oral medication. The medication is administered in two stages. The first stage, mifepristone, is taken at the abortion facility, and the patient self-administers the second stage, misoprostol, at her home. No surgery is required with medication abortion, with the products of conception passing at the patient's home. In July 2007, PPKM sought clarification from DHSS that the Brous Center is not required to be licensed under the Act, as it does not perform surgical procedures. However, DHSS determined the Brous Center meets the statutory definition of an ASC and would be required to satisfy the regulatory requirements. On August 9, 2007, PPKM requested a waiver from the regulation's requirements and has not received a response.

The Columbia Center provides abortions by surgical methods, as well as by medication, through the first trimester of pregnancy. The Columbia Center began providing abortions in 1975, with a break in abortion services between 1999 and 2002. The Columbia Center's abortion and related services account for under 51% of its patients and revenues, so it does not "operate *primarily* for the purpose of providing surgical procedures" and had not previously been required to comply with the Act. In July 2007 PPKM sought licensure from DHSS, stating it was willing to comply with the physical requirements for Pre-Existing Facilities. DHSS determined (1) the Columbia Center was required to comply with the New Construction regulations not those for Pre-Existing Facilities, and (2) the Columbia Center did not satisfy these regulations. The Columbia Center subsequently requested these requirements be waived and has not received a response.

Dr. Palmer has provided first-trimester surgical and medication abortions at the same location in Bridgeton, Missouri, for over thirty years. Until now, he has not been required by the State of Missouri to obtain a license from DHSS for his private practice, Women's Care Gynecology, Inc. ("WCG"), because WCG's abortion and related services account for under 51% of its patients and revenues. In the months preceding the effective date of the Act's amendments, Dr. Palmer sought clarification from DHSS as to whether he is now required to obtain a license for his private practice, and if so,

3

which aspects of the ASC licensing regulations he must meet. DHSS has determined that WCG will be regulated as an abortion facility. Additionally, DHSS determined that WCG must comply with the New Construction regulations.

Though DHSS has decided to apply the New Construction requirements, Mr. Linneman assured the Court that DHSS will work with Plaintiffs to develop a reasonable timeline to come into compliance and would not require Plaintiffs to immediately cease providing abortions so long as Plaintiffs are moving toward compliance in good faith. Additionally, DHSS has expressed a willingness to grant waivers and/or deviations to Plaintiffs. The collaborative process Mr. Linneman described will seek to achieve the State's goal of insuring women's health and safety while, at the same time, making compliance economically and physically feasible for Plaintiffs. More details about Mr. Linneman's testimony will be set forth below.

## II. DISCUSSION

Plaintiffs claim the 2007 Amendment was enacted in order to eliminate, or make more difficult, access to abortion in Missouri and requests that the Court issue a preliminary injunction enjoining application of the Act against Plaintiffs pending the outcome of the litigation. Defendants justify the Act, and application of the regulations to Plaintiffs, based on the State's interest in insuring the health and safety of women. In determining whether a plaintiff should be granted a preliminary injunction, this Court must weigh "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

### A. Standing

Defendants first contend that Plaintiffs lacks standing to pursue their claims. The

4

Supreme Court has recognized that it is appropriate to allow a physician to assert rights of women patients in abortion cases. Singleton v. Wulff, 428 U.S. 106, 118 (1976). However, Defendants contend that in this case, the interests of the Plaintiffs are not in alignment with those of the women they serve because the Plaintiffs are working against regulations meant to protect the health and safety of women seeking abortions. Plaintiffs argue the new regulations will have the effect of drastically limiting the availability of abortion. Plaintiffs interest in keeping their facilities in operation, therefore, align with their patients' interest in being able to obtain an abortion when needed. See Charles v. Carey, 627 F.2d 772, 779 n.10 (7th Cir. 1980) (holding that physicians could assert their patients' rights despite defendants' argument that the "right to know" law protected women from "abusive medical practices"). Additionally, PPKM is permitted to assert the constitutional claims of its patients, without the necessity of a physician or individual plaintiff as a party-plaintiff. Planned Parenthood of Minn. Inc., v. Citizens for Community Action, 558 F.2d 861, 865 n.3 (8th Cir. 1977) ("There is an intimate relationship between Planned Parenthood and its patients and the right of a pregnant woman to secure an abortion is inextricably bound up with the ability of Planned Parenthood to provide one.") (quotations omitted). The Court finds Plaintiffs will adequately represent their patients' constitutional rights and therefore have standing in this instance. See Okpalobi v. Foster, 190 F.3d 337, 353 (5th Cir. 1999).

Plaintiffs also have standing to protect their own interests. Id. at 867. If any Plaintiff allows five or more abortions to be performed monthly without obtaining a license, it will have committed a crime. Thus, both Plaintiffs have demonstrated a "sufficiently direct threat of personal detriment" to establish standing. Doe v. Bolton, 410 U.S. 179, 188 (1973). Further, Plaintiffs face loss of revenue and potential closure if forced to stop providing abortion services. This threat is also sufficient to confer standing. See, e.g., Pilgrim Med. Group v. New Jersey State Bd. Of Med. Examiners, 613 F. Supp. 837, 848 (D.N.J. 1985).

## B. Pullman Abstention with an England Reservation of Rights

Plaintiffs request that after this Court issues the preliminary injunctions, it abstain pursuant to Railroad Commission of Tex. v. Pullman, 312 U.S. 496 (1941). Further, Plaintiffs ask the Court to allow them to return to federal court to pursue any federal constitutional claims remaining after the state court proceedings are complete under England v. Louisiana State Bd. of Med. Examiners, 375 U.S. 411 (1964). The Court holds the issues in this case do not meet the requirements for Pullman abstention. Abstention under Pullman is appropriate if "difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 236 (1984). The decision of whether to abstain is within the district court's discretion. National City Lines, Inc. v. LLC Corp., 687 F.2d 1122, 1126 (8th Cir. 1982). Pullman abstention, which is "the exception, not the rule," Hawaii Housing Auth., 467 U.S. at 236, requires two conditions to be met:

    (1) there must be an unsettled issue of state law, and

    (2) there must be a possibility that the state law determination will moot the federal constitutional question raised.

National City Lines, 687 F.2d at 1126. "[T]he relevant inquiry is not whether there is a bare, though unlikely, possibility that state courts might render adjudication of the federal question unnecessary." Hawaii Housing Auth., 467 U.S. at 237. Rather, abstention is not warranted unless "the statute is of an uncertain nature, and is obviously susceptible of a limiting construction." Id. (quoting Zwickler v. Koota, 389 U.S. 241, 251 n.14 (1967)).

Plaintiffs first argue that a state court should decide whether the Act is applicable to medication abortion. The Act states that an "establishment operated for the purpose of performing or inducing . . . five or more first trimester abortions per month" is considered an ASC. § 197.200, RSMo. Defendants argue the word "induce" is evidence the Legislature wanted to include more than just surgical abortion, because surgical abortions are "perform[ed]." Plaintiffs first respond that a surgical abortion could reasonably be described as being "induc[ed]." However, such a construction

6

would make the term "inducing" redundant and merely duplicative of "performing." Plaintiffs also argue that "inducing" abortion could refer to a surgical procedure known as an "induction abortion." At the very least, the statute is broad enough to include medication abortion. Even if the statute is ambiguous a state court is not likely to disrupt DHSS' plausible interpretation of it.[1] See, e.g., State ex rel. Webster v. Missouri Resource Recovery, Inc., 825 S.W.2d 916, 931 (Mo. Ct. App. 1992) ("If the agency's interpretation of a statute is reasonable and consistent with the language of the statute, it is entitled to considerable deference.").

Plaintiffs also argue that the question of whether they are entitled to have their facilities licensed under the Pre-Existing Facility regulations should be decided by a state court under Pullman. DHSS has interpreted its regulations to apply the New Construction requirements to establishments, including Plaintiffs', that have been newly deemed "abortion facilities." Missouri state courts give great deference to an agency's interpretation of its own regulations. See, e.g., Willard v. Red Lobster, 926 S.W.2d 550, 553 (Mo. Ct. App. 1992) ("When interpretation of an agency's own rule is at issue, we give deference to the agency's determination."). A state court may only overrule an agency's interpretation of its regulations if it finds the interpretation to be "unconstitutional, unlawful, unreasonable, arbitrary, or capricious or involv[ing] an abuse of discretion . . . ." § 536.150, RSMo. While, in the abstract, a state court could conceivably determine that DHSS' interpretation should be overruled, thereby making the federal constitutional claims moot, this slim possibility is insufficient to warrant abstention. Dr. Palmer also asks this Court to abstain to allow a state court to determine whether Dr. Palmer's private medical practice is exempt entirely from licensing as an ASC pursuant to 19 CSR § 30-30.010(1)(B)(2). DHSS has determined that the exemption does not apply to Dr. Palmer, and not arbitrarily so, considering the exemption is located within the general ambulatory surgical center regulations, not the abortion facility regulations. The possibility of a state court overturning this

---

[1] The Court's opinion in no way seeks to dissuade Plaintiffs from going to state court for resolution of these issues. However, the Court will not exercise its discretion to halt this litigation while a state court does so.

7

interpretation is therefore, again, remote. The Court denies Plaintiffs' Motions for Pullman abstention, making discussion of an England reservation unnecessary.

C. Probability of Success on the Merits

The Court finds that Plaintiffs have a significant probability of success on the merits of many of their claims. "Before viability, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy. It also may not impose upon this right an undue burden, which exists if a regulation's purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." Gonzales v. Carhart, 127 S. Ct. 1610, 1626-27 (2007) (quotations omitted). However, "the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child." Planned Parenthood v. Casey, 505 U.S. 833, 846 (1992). "Regulations designed to foster the health of a woman seeking abortion are valid if they do not constitute an undue burden." Id. at 878.

*1. PPKM's Facial Constitutional Challenges*

Pursuant to 42 U.S.C. § 1983, PPKM claims that, on its face, the Act violates the Due Process Clause of the Fourteenth Amendment because it was enacted for the purpose of imposing a substantial obstacle on access to abortion. PPKM also claims, without explanation, that the Act facially violates the Equal Protection Clause. The Court holds that PPKM does not have a probability of success of establishing these claims. Facial challenges to a law that allegedly creates an undue burden are subject to a rigorous standard, but an exact standard has yet to be decided by the Supreme Court. Compare Ohio v. Akron Center for Reproductive Health, 497 U.S. 502, 514 (1990) ("[B]ecause appellees are making a facial challenge to a statute, they must show that no set of circumstances exists under which the Act would be valid.") (quotations omitted), with Planned Parenthood v. Casey, 505 U.S. 833, 895 (1992) (holding an abortion regulation is facially unconstitutional if "in a large fraction of cases in which [the law] is

8

relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion").

Even if the slightly lesser standard from Casey is applied here, it is unlikely that PPKM will be able to meet its burden. For Plaintiffs to succeed, the Court would have to determine the statute and attendant regulations cannot be justified as a legitimate health or safety measure. While some aspects of the regulations appear to have a tenuous connection to health and safety (particularly in light of the specific nature of the procedure in question), the Court does not believe Plaintiffs will carry their heavy burden. This Court is not equipped to evaluate the added health and safety benefits to be derived from specific construction requirements. In addition, whether the construction regulations at issue create an undue burden depends on a host of factors, including a facility's current dimensions, specifications and components, as well as the cost of bringing that facility into compliance. In fact, because the New Construction regulations are relevant not only to the Plaintiffs in this case, but also to facilities that have yet to be constructed, to succeed on its facial challenge PPKM must establish that the regulations at issue would operate as an undue burden in a large fraction of those future instances as well. Complying with New Construction regulations from the ground up is surely far less onerous than making the needed changes to a structure that has already been built. The Court holds, therefore, that PPKM's facial challenges to the new regulations are unlikely to succeed.

*2. Plaintiffs' As-Applied Challenges*

PPKM and Dr. Palmer claim the Act and the regulations, as applied by DHSS to Plaintiffs, violate the Due Process Clause in that they are being applied by DHSS with the purpose and effect, absent judicial intervention, of imposing a substantial obstacle on access to abortion and that they are not reasonably related to patient health and safety and depart from accepted medical practice. Plaintiffs also claim the Act and the regulations, as applied by DHSS to Plaintiffs, violate the Equal Protection Clause. Plaintiffs seem to have some difficulty making their Due Process and Equal Protection arguments distinct, perhaps because whether a regulation is an undue burden may

9

depend, in part, on whether DHSS' application of the regulation to Plaintiffs is out of line with how DHSS regulates others. The legal reasoning, however, is more important than the label applied to the claim.

### a. The Act's Application to Medication Abortions

The Act's application to medication abortions likely violates both the Due Process and Equal Protection Clauses. For instance, the Brous Center does not perform any surgeries, yet the Act would require the Brous Center to comply with regulations uniquely applicable to establishments that do. Moreover, Defendants' explanations to date have not been terribly persuasive. For instance, it was suggested that adverse side effects from the medications could necessitate surgery – but then, adverse side effects from many medications could necessitate surgery. Many establishments prescribe medications (e.g. doctors offices, pharmacies, etc.) and are not required to become equipped to perform surgery. Even assuming the complications from medication abortion are severe and could require surgical follow-up, these possible complications arise after the patient has left the abortion facility. There is no requirement, guarantee, or quantifiable likelihood a woman experiencing such complications would return to the abortion facility. A woman is more likely to go to the nearest hospital for assistance. No other facility prescribing medication that may require surgical follow-up is required to be prepared to perform surgery.

Defendants also argue that the medication has the distinct ability to accomplish a procedure that otherwise would have to be performed surgically. Even if the medication is "distinct" in this ability, it does not explain the reasonableness of requiring a facility dispensing the medication to be prepared to perform actual surgery. Again, the potential problems arising from the non-surgical, albeit surgery-like, medication will not be remedied at the abortion facility. The State's asserted interest in insuring the patient can return to the medication's provider to remedy complications is nonexistent. Therefore, Plaintiffs are likely to succeed on their claim that it is an undue burden on the right to obtain an abortion and a violation of equal protection to require facilities that dispense medication for the purpose of inducing abortions to be licensed to perform

10

surgery on that basis.

### b. The Act's Application to Surgical Abortion
#### i. Plaintiffs' Regulatory Interpretation Argument

The situations of Dr. Palmer and the Columbia Center are different than that of the Brous Center because they provide surgical abortions as well as medication abortions. On the surface, requiring Dr. Palmer and the Columbia Center to comply with regulations governing facilities that perform surgery seems reasonable. Plaintiffs argue, however, that the regulations should be interpreted to allow Plaintiffs to comply with the Pre-Existing Facility regulations, rather than the New Construction regulations. Plaintiffs argument regarding which regulations apply, however, is not based on the constitution, but rather, on an interpretation of the words in the regulation. The State's interpretation of the regulations is the Plaintiffs' worst case scenario. However, the Court is not inclined to disallow the State's interpretation of a state regulation at this stage. Rather, for purposes of Plaintiffs' constitutional argument, the Court will assume the New Construction requirements apply, as DHSS has determined.

#### ii. Plaintiffs' Constitutional Argument

Dr. Palmer and PPKM state the New Construction requirements create an undue burden on the right to an abortion. More specifically, the Plaintiffs contend that compliance would be so cost-prohibitive as to require either passing on the additional expense to patients or to cease their abortion practices. Additionally, Dr. Palmer states that WCG may be forced to close entirely without the revenue it receives from its abortion practice. This effect will not only harm Dr. Palmer financially, but it will also harm his patients by interrupting their continuity of care and depriving them of the ability to obtain an abortion in a private office setting. Additionally, PPKM alleges its patients' access to abortion will be limited by shutting down Missouri's only abortion facilities located outside the St. Louis area. Whether these burdens are "undue" requires a comparison of their safety value to the cost (monetary and otherwise) of compliance.

The Plaintiffs contend the New Construction requirements serve no legitimate

11

purpose because compliance under the Pre-Existing Facility regulations will insure patient care and safety, while the New Construction regulations provide no medical benefit.[2] The Court is not persuaded that there is absolutely no medical benefit to be derived from the new regulations. It is likely that at least some of the New Construction standards, in some form, could improve the health and safety of at least some of the Plaintiffs' patients, so the State's interest would be sufficient to survive a constitutional challenge. An interest in insuring health and safety provides adequate justification for requiring an existing but unlicensed facility to undergo some changes in order to obtain mandated licensure.

The magnitude of the burdens really depends on whether Plaintiffs are actually required to fully comply with the New Construction requirements. DHSS has been explicit in stating the New Construction regulations, rather than those for Pre-Existing Facilities, will be applicable to Plaintiffs. However, DHSS has also expressed not only a willingness to work with Plaintiffs in establishing a timeline and process for complying with the new regulations, but also a willingness to consider deviations from the regulations. The regulations expressly contemplate such deviations. 19 C.S.R. § 30-30.070(1). Mr. Linneman stated that the monetary cost to Plaintiffs' in satisfying the

---

[2] Dr. Palmer argues the application of the Act to WCG violates his equal protection rights in another respect as well. He cites to 19 CSR § 30-30.010(1)(B)(2) which exempts private physicians' offices from the definition of ambulatory surgical center. Because other private physicians' offices are exempted from the Act, he argues, he is being treated differently by not being exempted. Dr. Palmer's argument fails for two reasons. First, the exemption he refers to is contained within the regulations for general ambulatory surgical centers, not in the regulations covering abortion facilities. Second, it appears that 19 CSR § 30-30.010(1)(B)(2) is a meaningless provision that has never had any effect. A private physician's office has never met the definition of an ambulatory surgical center, which requires surgery to account for at least 51% of its patients or revenues. Mr. Linneman stated that if a private physician's office did operate primarily for the purpose of performing surgery, it would be required to be licensed under the Act despite the exemption. In other words, the exemption would have applied only to doctor's offices that provided less than 51% surgeries, in which case, no exemption would have been needed. Thus, the Act's application to Dr. Palmer does not likely violate the Equal Protection Clause in this respect.

Case 2:07-cv-04164-ODS   Document 74   Filed 09/24/07   Page 12 of 16

regulations would be a factor considered in the decision of whether and to what extent deviations and waivers would be allowed. TR. III at 215.[3] Additionally, Mr. Linneman stated Plaintiffs' strong safety record while using their current facilities would be considered in evaluating the need for particular measures. TR. III at 207. Such waivers would be granted, he stated, so long as the request proposed an "acceptable alternative just as safe for the patient." TR. III at 185. Therefore, whether application of the New Construction regulations is a violation of Plaintiffs' constitutional rights depends on what these regulations actually require. This, in turn, depends on whether and to what extent such deviations and/or waivers are permitted by DHSS. Applying the New Construction requirements to Plaintiffs in their fullest form would likely be a constitutional violation, but regulations that adequately take into account the burden on Plaintiffs would likely not. Therefore, it is prudent to maintain the status quo while collaboration and negotiation between the parties proceeds.

Dr. Palmer also claims the Act is unconstitutionally vague. The Court does not believe Dr. Palmer will likely succeed on this claim. A law is unconstitutionally vague when people "of common intelligence must necessarily guess at its meaning." United States v. Lanier, 520 U.S. 259, 266 (1997). The language in the New Construction regulations is clear; however, to what extent Dr. Palmer will have to comply with them has yet to be determined. DHSS has expressed a commitment to work with Dr. Palmer while he moves toward compliance and has assured him that no criminal prosecution will occur in the meantime. Therefore, Dr. Palmer's void for vagueness contention is unlikely to succeed.

Dr. Palmer also raises a procedural due process argument based on DHSS' early confusion as to which regulations would apply to WCG. At this stage, however, DHSS has been quite clear in its position that the New Construction regulations apply, but that DHSS will work with Dr. Palmer to move WCG toward compliance and to negotiate deviations from the requirements as written. Therefore, before Dr. Palmer is deprived of any liberty or property, he will have received all the process he is due.

---

[3] TR. III refers to the transcript for the proceeding held on September 10, 2007.

## D. Irreparable Harm

The Court finds that Plaintiffs will suffer irreparable harm if a preliminary injunction is not issued at this time. Plaintiffs' showing that the Act will interfere with the exercise of their "constitutional rights and the rights of [their] patients" constitutes irreparable harm. Planned Parenthood of Minn. Inc. v. Citizens for Cmty. Action, 558 F. 2d 861, 867 (8th Cir. 1977). See also, e.g., Adams v. Baker, 919 F. Supp. 1496, 1505 (D. Kan. 1996) (where "the plaintiff has alleged deprivation of her constitutional rights, . . . no further showing of irreparable harm is required"). Additionally, because Defendants are immune under the Eleventh Amendment from a retroactive award of damages if the Court ultimately finds application of the Act to Plaintiffs unconstitutional, any monetary harm suffered by Plaintiffs will not be compensable. See Marigold Foods, Inc. v. Redalen, 809 F. Supp. 714, 720 (D. Minn. 1992).

## E. Balance of Harm vs. Injury to Defendant

Defendants will suffer little or no harm if the Act is enjoined. Plaintiffs' facilities have been operating for years without complying with the new regulations applicable to abortion facilities, and Defendants have offered no suggestion of an inadequate safety record. Additionally, both Plaintiffs are in near compliance with the regulations that apply to Pre-Existing Facilities, regulations that DHSS must have believed were adequate, if not ideal for, insuring patient safety. The economic harm coupled with the harm suffered by patients who are either delayed or prohibited from receiving an abortion outweighs the harm done to Defendants, whose stated willingness to provide Plaintiffs with time to come into compliance shows the minimal injury sustained by delaying enforcement of the regulations during the time the preliminary injunction is effective.

14

## F. Public Interest

Defendants contend protecting the health of women is an important public interest.  This interest is outweighed by the public's minimal interest in enforcement of an unconstitutional law.  In addition, the Court is not presently persuaded that applying the Act to the Brous Center actually furthers that interest.  A delay in application to the Columbia Center and to Dr. Palmer should also do little to impair women's health, as evidenced by DHSS' expressed willingness to allow Plaintiffs to continue to provide abortions while they work toward compliance.

## G. Proceedings Going Forward

Plaintiffs show a strong probability of succeeding on their claim that requiring full compliance with the New Construction regulations, without being given a meaningful opportunity to pursue waivers and/or deviations from some of the requirements, violates their constitutional rights.  DHSS has assured the Court that such an opportunity exists.  It is prudent to preliminarily enjoin application of the Act to Plaintiffs until these discussions are complete, particularly given (1) DHSS' insistence that Plaintiffs would be allowed to continue operations during such discussions anyway and (2) the minimal harm to DHSS from granting such an injunction.  Plaintiffs are directed to seek specific deviations and/or waivers from specific requirements within the New Construction regulations.  These requests should explain how near Plaintiff is to full compliance, how costly coming into full compliance would be, and the justification for finding Plaintiff's proposal adequate in meeting the State's goal of protecting women's health and safety.  Plaintiffs should complete this process within thirty days.  Defendants should fully consider each request for deviation and/or waiver and respond to Plaintiffs within thirty days, explaining as to each request whether it is granted, and if not, what Plaintiffs can do to satisfy the regulations' purpose of protecting health and safety.  The parties should continue these discussions until acceptable solutions have been devised.  If any party believes an impasse in the collaborative process has been reached, that party

15

may seek dissolution of the preliminary injunction or issuance of a permanent injunction.

### III.  CONCLUSION

In light of the foregoing discussion, it is ORDERED that Defendants are preliminarily enjoined from enforcing the provisions of section 197.200 et seq. and its attendant regulations as to Plaintiffs.  This preliminary injunction shall remain in effect pending further order of the Court.  No bond will be imposed.
IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: September 24, 2007                    UNITED STATES DISTRICT COURT